Filed 11/18/13  Certified for publication 12/11/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| KYLE HUNTER, | B244832 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC480825) |
| v. | |
| CBS BROADCASTING, INC., | |
| Appellant and Defendant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ramona G. See, Judge.  Reversed and remanded.

Kelly Drye & Warren, Keri E. Campbell and Sarah L. Cronin, for Appellant and Defendant.

Allred, Maroko & Goldberg, Gloria Allred, Michael Maroko and John Steven West, for Respondent and Plaintiff.

_____

**INTRODUCTION**

Kyle Hunter filed a discrimination complaint alleging that CBS Broadcasting refused to hire him as a weather news anchor because of his gender and age. CBS filed a motion to strike the complaint pursuant to Code of Civil Procedure section 425.16 arguing that its selection of a newscaster qualified as an act in furtherance of its free speech rights. The trial court denied the motion, concluding that Hunter's claims did not arise from CBS's hiring decision, but rather from its discriminatory employment practices. We reverse the order and remand for the trial court to consider whether Hunter has demonstrated a reasonable probability of prevailing on the merits of his claims.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.** *Summary of Hunter's Complaint*

On March 15, 2012, plaintiff Kyle Hunter filed an employment discrimination complaint alleging that two local CBS television stations – KCAL and KCBS – had "repeatedly shunned [him] for numerous on-air broadcasting positions . . . due to . . . his gender and his age." The complaint alleged that, in 2010, KCBS chose not to renew the contract of its then-weather anchor Johnny Mountain, which was "part of [a] plan to turn prime time weather broadcasting over to younger attractive females."

Although Hunter expressed interest in "filling [Mountain's] vacancy," KCBS decided to hire Jackie Johnson, a "young attractive female" who had previously served as the weather anchor on KCAL's prime time newscast. After learning that Johnson had been hired to replace Mountain at KCBS, Hunter notified KCAL that he would like to be considered for Johnson's former anchor position. KCAL, however, began "quietly interviewing . . . . young, attractive females to [replace Johnson]" and told Hunter "there was not 'an opening for [him] now.'"

In May of 2010, KCAL posted a "sham" notice regarding its weather anchor position. At the time it posted the notice, KCAL had already hired "an attractive younger female" named Evelyn Taft, "whose age and gender were key considerations in the hiring

decision." When Hunter learned about Taft's hiring, he contacted the station manager and was told that he had not been considered for the position because KCAL "'catered to . . . male viewers'" and that Hunter "'wouldn't be the type men would want to look at.'"

Hunter's complaint alleged that he was "far more qualified, and far more experienced" to serve as a weather anchor than either Johnson or Taft. The complaint further alleged that Hunter had been forecasting and broadcasting the weather for over 23 years, had won several prestigious awards and was certified by the American Meteorological Society (AMS). Taft, on the other hand, had only "two or three years of experience," was not certified by the AMS and "ha[d] not won any broadcast awards."

The complaint asserted two causes of action against CBS for violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 *et seq.* (FEHA)). The first claim alleged that KCBS and KCAL had "adopted a policy of filling vacant prime time on air weather broadcast positions with attractive females, and of refusing to hire males to permanently fill those positions." The second claim alleged that KCBS and KCAL had "adopted a policy of filling vacant prime time on air weather broadcast positions with individuals under the age of 40, [and] of refusing to hire individuals over 40 to permanently fill those positions." The complaint asserted that CBS's "[gender] and age based polic[ies], and [its] resulting employment decisions, violated the prohibition against gender [and age] discrimination contained in [] Government Code [section] 12940."

## B. *CBS's Motion to Strike the Complaint Pursuant to Code of Civil Procedure Section 425.16*

### 1. *Summary of CBS's motion to strike and supporting evidence*

On May 29, 2012, CBS filed a motion to strike Hunter's complaint pursuant to Code of Civil Procedure section 425.16.[1] CBS contended that Hunter's claims were based on its selection of on-air weather reporters and that such conduct qualified as

---

[1] Unless otherwise noted, all further statutory citations are to the Code of Civil Procedure.

3

protected activity within the meaning of section 425.16, subdivision (e). It further contended that Hunter could not make a prima facie showing that he had not been hired to fill the KCBS or KCAL weather anchor vacancies as a result of his gender or age.

In support of its motion, CBS submitted a declaration from Scott Diener, who was the Vice President and News Director of KCBS and KCAL. Diener's declaration stated that the "duopoly" of KCBS and KCAL [collectively "the duopoly"] made-up the "nation's largest local television news operation." According to Diener, the "number one reason why people watch[ed] the local news" was to obtain information about the weather. As a result, the duopoly's weather anchors were "local celebrities" who had a significant effect on newscast ratings.

Diener, whose duties included "recruiting and hiring . . . staff members," explained that selecting on-air news personnel, and the weather anchor in particular, was "one of the most critical decisions in putting together a news team. The anchor must not only be knowledgeable and reliable with respect to the weather forecasts, but also must be a personality whom people want to invite into their home on a daily basis. The weather anchor has to inspire confidence and trust while being likeable and inviting to the public."

Diener stated that when making a hiring decision for an on-air position, he normally reviewed "the individual's resume and demo reel." If Diener believed the individual was sufficiently talented, he would then "interview them and have them audition," which would include a "mock weather segment." Diener asserted that the three primary qualifications he considered when evaluating "an on-air [weather] position" were: (1) meteorology background and experience; (2) on air presence; and (3) chemistry with other members of the news team.

Diener explained that, shortly after he became the duopoly's news director in January of 2010, he received an email from Hunter stating that he would like to be "considered for any available weather anchor positions – even fill-in work." Diener reviewed Hunter's "demo reel" and "did not believe he had the talent, skill or on-air presence to be an on air weather broadcaster in the Los Angeles market." Diener also felt

4

that Hunter's presentation was not "polished" and that his "on-air persona was hokey and over the top." Over the next two months, Hunter continued to send Diener numerous emails "with requests for employment, brochures, links to his demo reels [and] invitations to lunch and dinner."

Diener also explained why the duopoly had selected Johnson and Taft to serve as its two prime time weather anchors. According to Diener, he had chosen Johnson to fill Johnny Mountain's vacated position at KCBS based on her six years of experience as the prime time weather anchor at KCAL. After promoting Johnson to KCBS, the duopoly began searching for a candidate to fill Johnson's vacancy at KCAL. Diener received dozens of submissions for the opening, which he narrowed to eight candidates consisting of five men and three women. Hunter was not considered. The two finalists were Evelyn Taft, a female under the age of 40, and Jim Castillo, a male over the age of 40. Taft had a degree in broadcast journalism from the University of Southern California and had previously worked as a weather anchor in Santa Maria and Salinas, California. Between 2008 and 2010, Taft had served as a weather anchor in San Francisco, which was then the sixth largest news market in the country. Taft and Castillo both auditioned for the position, but Diener chose to hire Taft.

Shortly after he hired Taft, Diener internally promoted Josh Rubinstein to serve as the weather anchor on KCBS's morning show and hired Richard Fields to serve as a "weekend and fill-in weather anchor." Following Taft's hire, the duopoly had five weather anchors on staff; three males over the age of 40 and two females under the age of 40. Diener specifically denied that he had considered the gender or age of Johnson, Taft, Hunter or any other candidate in making his hiring decisions.

> 2. *Summary of Hunter's opposition to the motion to strike and supporting evidence*

In his opposition, Hunter argued that the court should deny CBS's motion to strike because the "gravamen" of his claims "was discrimination rather than free speech." Hunter contended that section 425.16 "was only intended to dispose of lawsuits . . .

brought to chill the '*valid* exercise of constitutional rights[]'" and that "[d]iscrimination in employment is . . . NOT a valid exercise of Free Speech." He further contended that "CBS was essentially argu[ing] that it, along with every other producer of programming, enjoys complete immunity from FEHA liability based on the First Amendment." According to Hunter, however, "[n]o California case . . . . ha[d] ever held that the choice of who to employ as a weather broadcaster is so sacred that it enjoys First Amendment immunity from anti-discrimination laws."

Hunter also argued that even if section 425.16 applied to his claims, he had demonstrated a reasonable probability of prevailing on the merits at trial. In support, Hunter cited evidence that: (1) the duopoly's only two prime time weather anchors (Johnson and Taft) were both females who were under the age of 40; (2) Taft and Johnson were both "cut from the same blond, attractive, buxom mold," evidencing "CBS'[s] intent to use gender and youth as criteria"; (3) CBS did not post job opening notices about their KCBS or KCAL weather anchor positions; and (4) Hunter was told that CBS wanted to hire a female for the KCAL prime time weather anchor position. Hunter also asserted that he had provided evidence demonstrating that he and two other male candidates were "as or better qualified" than either Johnson or Taft.

In support of his opposition, Hunter provided a declaration asserting that he had "been involved in weather broadcasting in one form or another" since 1985. Hunter's declaration contained a detailed work history that included, among other things, numerous weather newscast production positions and several on-air weather anchor positions. The declaration also described Hunter's education and listed various meteorology-related awards and certifications he had received in the past. According to Hunter, he was generally "well-liked by [his] co-workers and well-regarded in [his] profession."

Hunter's declaration also discussed his efforts to obtain a prime time weather anchor position at KCBS and KCAL. Hunter asserted that he initially contacted CBS after learning that Johnny Mountain's contract would not be renewed at KCBS. Hunter told CBS he would like to be interviewed for the position and provided a resume and

6

broadcast samples. When Hunter learned CBS had hired Johnson to replace Mountain, he contacted Scott Diener about obtaining an interview to fill Johnson's former position.

Hunter stated that, while taking a tour of CBS in April of 2010, he saw his friend Josh Rubinstein, who was part of the duopoly's weather news team. Rubinstein told Hunter that CBS was "'looking for a woman to fill the [KCAL weather anchor] position.'" Shortly after this conversation, Hunter learned that CBS was interviewing "young, female candidates . . . for the KCAL weather anchor job." Hunter decided to send an email to Steven Maudlin, the President and General Manager of KCBS/KCAL regarding his "interest in a position at CBS." Maudlin, however, informed Hunter that CBS did not currently have "an opening for him."

Hunter's declaration also stated that he had reviewed the qualifications of several other male candidates who had applied for the KCAL weather anchor position, including Jim Castillo, Josh Rubinstein and Kai Goldberg. Hunter contended that, based on his "knowledge and experience," he "knew" that each of the three men were "qualified to be a prime-time weather broadcaster for KCBS and KCAL."

### 3. *Trial court proceedings*

At the motion hearing, CBS argued that section 425.16 applied to Hunter's claims because "the acts or conduct . . . at issue" consisted of CBS's "decision[s] as to who to select to represent itself in an on air broadcast which . . . is an act in furtherance of free speech." CBS also argued that the mere fact Hunter had alleged it acted with "a discriminatory motive in making that decision[] does not change what the underlying act is and it doesn't take it outside of the protection of [section 425.16]."

Hunter, however, argued that the "act" underlying his claims was CBS's adoption of a "hiring policy" that "impose[d] a ban on the hiring of males from the most select positions." Hunter asserted that CBS had failed to identify a "single [case] that says . . . producers of television products are immune from FEHA liability" or that "hiring in this context is somehow protected First Amendment activity." According to Hunter, his

7

discrimination action was "a run of the mill employee case that precede[d] the creative process. To rule otherwise is to rule that there is a complete immunity to FEHA."

Following the hearing, the trial court issued an order denying CBS's motion to strike "on the grounds that [CBS] has not shown that its hiring decisions regarding weather anchors constitute conduct in furtherance of [CBS's] right of free speech in connection with a public issue." CBS filed a timely appeal of the court's order. (See § 425.16, subd. (i) ["An order granting or denying a special motion to strike shall be appealable under Section 904.1"]; § 904.1, subd (a)(13).)

## DISCUSSION

### A. Summary of Section 425.16 and Standard of Review

Section 425.16, "commonly referred to as the anti-SLAPP statute" (*Club Members For An Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312 (*Sierra Club*),[2] is intended "to provide for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (*Id.* at p. 315.) The section authorizes the filing of a special motion that requires a court to strike claims brought "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Section 425.16 "'requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted." (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.) "'First the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. [Citation.] "A defendant meets this burden by demonstrating

---

**2**    The acronym "SLAPP" stands for "strategic lawsuits against public participation." (*Sierra Club, supra,* 45 Cal.4th at p. 312.)

8

that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e)" [citation].' [Citation.] [¶] If the defendant makes this showing, the court proceeds to the second step of the anti-SLAPP analysis. [Citation.] In the second step, the court decides whether the plaintiff has demonstrated a reasonable probability of prevailing at trial on the merits of its challenged causes of action. [Citations.] [¶] Conversely, if the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step." [Citation.]" (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 265-266 (*Tuszynska*) [footnotes omitted].)

"An appellate court reviews an order granting an anti-SLAPP motion under a de novo standard. In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v ADP Screening & Selection Services* (2010) 182 Cal.App.4th 1644, 1651-1652.)

### B. The Trial Court Erred in Concluding that Hunter's Claims Do Not Arise from a Protected Activity

Under the two-step process applicable to anti-SLAPP motions, we must first determine whether CBS made a threshold showing that Hunter's claims arise from a protected activity. The trial court concluded that CBS failed to make such a showing, and denied the motion on that basis.

In assessing whether a cause of action arises from protected activity, "we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or gravamen of a plaintiff's cause of action . . . . We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]' [Citation]." (*Tuszynska, supra,* 199 Cal.App.4th at p. 267.) "[T]he critical point is whether the plaintiff's cause of action itself was based on

9

an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, "courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. '[C]auses of action do not arise from motives; they arise from acts.' [Citation.]" (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822 (*Anapol*).) "'The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.' [Citation.]" (*Ibid.*)

Section 425.16, subdivision (e) sets forth four categories of protected activity. CBS contends that the conduct underlying Hunter's claims fall within section 425.16, subdivision (e)(4), which defines protected activity to include "any . . . conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." A cause of action arises from protected activity within the meaning of section 425.16, subdivision (e)(4) if the plaintiff's claims are predicated on conduct that is: (1) in furtherance of the right of free speech, and (2) in connection with a public issue or issue of public interest.

> *1. Hunter's claims are predicated on the selection of a news anchor, which qualifies as conduct in furtherance of the exercise of free speech rights*

The allegations in Hunter's complaint make clear that the injury-producing conduct underlying his employment discrimination claims consists of CBS's decisions about whom to hire as the on-air weather anchors for its KCBS and KCAL prime time newscasts. The complaint repeatedly asserts that: (1) CBS chose "to hire young attractive women" to serve "as weathercasters"; (2) CBS "shunned [Hunter] for numerous on-air [weather] broadcasting positions . . . due to . . . his gender and his age"; and (3) these "employment decisions" violated FEHA. Indeed, all of the allegations underlying Hunter's discrimination claims relate to the allegedly unlawful manner in

10

which CBS selected its weather anchors. CBS contends that this conduct–the selection of a weather anchor–qualifies as an act in furtherance of the exercise of free speech. We agree.

"An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right." (*Tamkin v. CBS Broadcasting, Inc*. (2011) 193 Cal.App.4th 133, 143 (*Tamkin*).) Our courts have previously recognized that "[r]eporting the news" (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164 [*KCOP*]) and "creat[ing] . . a television show" both qualify as "exercise[s] of free speech." (*Tamkin, supra*, 193 Cal.App.4th at p. 143; *KCOP, supra*, 110 Cal.App.4th at p. 164.) CBS's selections of its KCBS and KCAL weather anchors, which were essentially casting decisions regarding who was to report the news on a local television newscast, "helped advance or assist" both forms of First Amendment expression. The conduct therefore qualifies as a form of protected activity. (See *Tamkin, supra*, 193 Cal.App.4th at p. 143 [writer's use of plaintiffs' names in a draft script of a television show qualified as protected activity because it "helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show"]; *KCOP, supra*, 110 Cal.App.4th at p. 164 [allegedly unlawful newsgathering technique was in furtherance of First Amendment speech rights because it aided in the reporting of news]; *Doe v. Gangland Productions, Inc.* (9th Cir., 2013) 730 F.3d 946, 953 (*Gangland*) ["California courts have held that pre-publication or pre-production acts such as investigating, newsgathering, and conducting interviews constitute conduct that furthers the right of free speech"].)

Hunter, however, asserts that there are several reasons why the trial court correctly concluded that section 425.16 does not apply to his claims. First, he contends that the "conduct" underlying his causes of action is not CBS's selection of its weather anchors, but rather CBS's decision to utilize discriminatory criteria in making those selections. This argument, however, confuses the conduct underlying Hunter's claim–CBS's employment decisions–with the purportedly unlawful motive underlying that conduct–employment discrimination. The California Supreme Court has clarified that when

11

assessing whether claims arise from protected activity, courts must distinguish between the acts underlying a plaintiff's causes of action and the "'claimed illegitimacy of [those] acts[, which] is an issue . . . the plaintiff must raise and support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' [Citation.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94 (*Navellier*).)

*Tuszynska*, *supra*, 199 Cal.App.4th 257, which also involved a gender discrimination claim, is illustrative. The defendants in *Tuszynska* administered a "prepaid legal plan" that was "created [by an employee organization] . . . to fund and provide legal representation and assistance to the [organization's] members in job-related civil, criminal, and administrative matters." (*Id*. at p. 262.) The defendants selected counsel for members in need of legal representation from a panel of pre-approved attorneys. Plaintiff, who was the only female on the panel, filed a discrimination complaint alleging that plan administrators had refused to assign her cases on the basis of her gender. The defendants filed a motion to strike the complaint arguing that plaintiff's claim was predicated on their attorney selection decisions, which qualified as an act in furtherance of protected petitioning activity. In opposition, the plaintiff argued that her "allegations of gender discrimination [were] not based on [the defendants' attorney selections], but [were] instead based on defendants' purportedly distinctive 'conduct' in failing to assign cases to her 'because she is a woman.'" (*Ibid*.) The trial court agreed, reasoning "that the 'gravamen' of plaintiff's claims was that 'because she is a woman, she is not getting cases.'" (*Ibid*.)

The appellate court reversed, concluding that the trial court had improperly "conflate[d] defendants' alleged injury-producing conduct – their failure to assign new cases to plaintiff . . . – with the unlawful, gender-based discriminatory motive plaintiff was ascribing to defendants' conduct – that plaintiff was not receiving new assignments or continued funding because she was a woman." (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 268.) The court explained that section 425.16 "applies to claims 'based on' or 'arising from' statements or writings made in connection with protected speech or petitioning

12

activities, regardless of any motive the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities." (*Id.* at p. 268.) The court further explained that, in the case before it, the plaintiff was "suing defendants for gender discrimination because she claims they did not assign case work to her . . . because she is a woman. Her gender discrimination claims are thus based squarely on defendants' attorney selection . . . decisions. Whether defendants had a gender-based discriminatory motive in not assigning new cases to plaintiff . . . is entirely separate and distinct from whether, under the anti-SLAPP statute, plaintiff's gender discrimination claims are based on defendants' selection . . . decisions. Courts must be careful not to conflate such separate and distinct questions." (*Id.* at pp. 268-269.)

This case cannot be meaningfully distinguished from *Tuszynska*. Hunter's employment discrimination claims assert that CBS did not hire him to serve as a weather anchor because of his age and gender. As in *Tuszynska*, his claims are thus based squarely on CBS's decisions regarding its choice of a weather anchor, which were acts in furtherance of its First Amendment rights. Whether CBS had a gender or age-based discriminatory motive in not selecting Hunter to serve as a weather anchor is an entirely separate inquiry from whether, under section 425.16, Hunter's discrimination claims are based on CBS's employment decisions.

Hunter, however, argues that two other decisions, *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments* (2007) 154 Cal.App.4th 1273 (*Alta Loma*) and *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611 (*Martin*), have held that claims predicated on acts of discrimination are generally not subject to the anti-SLAPP statute. In *Alta Loma, supra*, 154 Cal.App.4th 1273, a landlord was attempting to remove a 13-unit apartment building from the rental market. As required under local rent control regulations, the landlord notified the tenants they had 120 days to vacate the premises. In response, plaintiff, a tenant in the building, informed the landlord she was disabled and therefore legally entitled to a one-year notice period. Although the plaintiff provided various forms of evidence to substantiate her condition, the landlord did not believe she had established any disability. Shortly after the 120-day

13

notice period expired, the landlord initiated an unlawful detainer action. Plaintiff, in turn, filed a discrimination complaint alleging the landlord had refused to accommodate her disability. The landlord filed a motion to strike the complaint pursuant to section 425.16 asserting that plaintiff's claim was predicated on the filing of an unlawful detainer action. The trial court denied the motion, concluding that the unlawful detainer action was incidental to plaintiff's claim, which was based on the landlord's refusal to acknowledge her disability.

We affirmed, explaining that plaintiff's lawsuit did not challenge "any act [the landlord] took with respect . . . to the unlawful detainer action[] it filed. . . . Instead, [plaintiff] sued [defendant] for its alleged acts in failing to make a reasonable accommodation for [plaintiff's] disability." (*Alta Loma, supra,* 154 Cal.App.4th at p. 1285.) The court noted that although the plaintiff's suit may have been "'triggered by'" the landlord's filing of the unlawful detainer action, plaintiff had not sued the landlord because of those activities. Rather, according to the court, the "suit [wa]s instead based on . . . claims [the landlord] discriminated against [plaintiff] by failing to accept the fact of, and accommodate, her disability by granting her an extension of her tenancy to one year." (*Id.* at p. 1287.)

*Martin, supra,* 198 Cal.App.4th 611, involved analogous circumstances. Plaintiff filed claims against his employer alleging that he had been discriminated against for refusing to retaliate against an employee. According to the complaint, the defendant's CEO had asked plaintiff to take disciplinary action against an employee who accused the CEO's executive assistant of racial discrimination. After plaintiff advised the CEO that conduct would be unlawful, the CEO started taking steps to "erod[e] plaintiff's responsibilities," which included (among other things) appointing employees without plaintiff's consultation and restructuring plaintiff's division while he was on leave. (*Id.* at p. 618.) The CEO also gave plaintiff a critical review before the Board of Directors and demanded that the Board require plaintiff to report to him. When plaintiff complained about his review, the CEO pressured him to resign. Plaintiff eventually filed claims for wrongful retaliation, racial discrimination and defamation.

14

The defendant moved to strike the complaint arguing that all of the claims derived from statements the CEO allegedly made during the board meeting. Although the trial court granted the motion with respect to the defamation claim, which was directly predicated on allegedly false statements the CEO had made at the board meeting, it denied the motion with respect to the remainder of plaintiff's claims. The defendant appealed, arguing that all of plaintiff's claims were governed by section 425.16.

The appellate court affirmed, explaining that most of the allegations in plaintiff's complaint had nothing to do with any protected activity. According to the court, plaintiff's primary assertion was that, after he had refused "to take punitive action against one of his employees," the CEO began harassing plaintiff's subordinates and taking measures to undermine plaintiff's authority. (*Martin, supra,* 198 Cal.App.4th at p. 625.) The court further explained that the CEO's conduct and statements at the board meeting were "mentioned only minimally in plaintiff's pleadings." (*Ibid*.) In the court's view, the pleadings' allegations demonstrated that the "gravamen" of plaintiff's action was retaliatory conduct unrelated to any petitioning activity.

Although *Alta Loma* and *Martin* both involved discrimination claims, neither case held, as Hunter suggests, that discrimination claims are generally not subject to section 425.16. Indeed, such a holding would have been directly contrary to the California Supreme Court's instruction that "[n]othing in the statute itself categorically excludes any particular type of action from its operation." (*Navellier, supra*, 29 Cal.4th at p. 92.) Rather, both cases examined the specific conduct underlying the particular discrimination claims at issue and concluded section 425.16 was inapplicable because the plaintiffs' references to protected activity were merely incidental to the unprotected acts upon which their claims were based. (See *Anapol, supra,* 211 Cal.App.4th at p. 823 ["If the allegations of protected activity are merely incidental to a cause of action based essentially on non-protected activity, the allegations will not transform the non-protected cause of action into an action subject to the anti-SLAPP law"].) In this case, however, CBS's protected activity–employment decisions regarding its weather anchors–is not

incidental to Hunter's discrimination claims; indeed, it is the very conduct on which his claims are based.

Hunter next contends that, even if his claims arise from CBS's employment decisions, section 425.16 is inapplicable because the act of hiring a reporter is not, in itself, a form of "protected speech" or an "exercise of free speech rights by CBS." As explained above, however, section 425.16 is not limited to claims based on constitutionally-protected free speech or petitioning activity; it also extends to conduct undertaken "in furtherance" of those constitutionally-protected activities. (See *KCOP, supra*, 110 Cal.App.4th at p. 166; *Hilton v. Hallmark Cards* (9th Cir. 2010) 599 F.3d 894, 903.) Thus, even if Hunter is correct that the act of hiring a weather anchor does not qualify as an exercise of free speech rights (an issue we need not decide), he has provided no argument as to why such conduct does not qualify as an act in furtherance of the exercise of such rights. For the reasons explained above, we conclude that it does.

Hunter also argues that applying section 425.16 under the circumstances of this case would be "tantamount to affording news broadcasters with . . . immunity from anti-discrimination laws." This argument, however, "is predicated on the "fallacy that the anti-SLAPP statute allows a defendant to escape the consequences of wrongful conduct by asserting a spurious First Amendment defense. [Citation.] In fact, the statute does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning [citation]," nor does it confer "any kind of 'immunity'" on protected activity. (*Navellier, supra*, 29 Cal.4th at p. 93.) Instead, under section 425.16, a plaintiff may pursue a discrimination claim or any other cause of action based on protected activity if he or she is able to present the "minimal" evidence necessary to demonstrate a reasonable probability of prevailing on the merits. (*Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1421.) As succinctly explained by the California Supreme Court, "[t]he Legislature's inclusion of a merits prong to the statutory SLAPP definition (§ 425.16, subd. (b)(1)) . . . preserves appropriate remedies for [causes of action based on protected activity] by ensuring that claims with the requisite minimal merit may proceed." (*Navellier, supra*, 29 Cal.4th at p. 93.)

16

In a closely-related argument, Hunter asserts that CBS has failed to identify any authority suggesting that the "First Amendment protects employment discrimination." However, this argument again "confuses the threshold question of whether the SLAPP statute applies with the question whether [plaintiff] has established a probability of success on the merits. The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the inquiry as to whether the plaintiff has established a probability of success would be superfluous." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305.)

### 2. *CBS's hiring of a weather anchor was in connection with a public issue or issue of public interest*

Hunter alternatively contends that even if CBS's hiring decisions were in furtherance of its free speech rights, that conduct does not qualify as protected activity under subdivision (e)(4) because it was not done "in connection with a public issue or an issue of public interest." Although Hunter acknowledges that the "reporting of weather . . . is certainly a matter of public interest," he asserts that CBS's "private employment decisions . . . are not."

During the trial court proceedings, Hunter did not raise any argument related to the "public issue" element of subdivision (e)(4). "'"[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court."'" (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399.) Because Hunter has not provided any reason why he failed to present this argument to the trial court, we deem the argument waived. (*See id*. at p. 1399 ["'"Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived has been waived"'"].)

Even if Hunter had not waived the argument, we would reject it on substantive grounds. Hunter essentially contends that the public had no interest in who CBS selected to serve as its weather anchor. His argument is predicated on the assumption that, to

17

qualify as protected activity under subdivision (e)(4), the defendant's conduct must be in furtherance of free speech rights and must also qualify as a public issue or issue of public interest. The statute, however, states that conduct must be in furtherance of the exercise of free speech rights "in connection" with a public issue or issue of public interest. Thus, the proper inquiry is not whether CBS's selection of a weather anchor was itself a matter of public interest; the question is whether such conduct was "in connection with" a matter of public interest. As Hunter concedes, weather reporting is a matter of public interest. CBS's decisions regarding who would present those reports to the public during its broadcasts was necessarily "in connection" with that public issue.[3] (See *Tamkin, supra*, 193 Cal.App.4th at pp. 143-144 [writer's decision to use names of private individuals as placeholders in draft of a television script qualified as protected activity because it was done in connection with a creating and broadcasting a popular television show]; *Gangland*, *supra*, 730 F.3d at pp. 955-956 [revealing confidential informant's identity during a documentary qualified as protected activity because the disclosure was made in connection with a television show that explored topics of public interest].)

### 3. On remand, the trial should determine whether Hunter has demonstrated a reasonable probability of prevailing on the merits

Hunter also argues that even if section 425.16 does apply to his claims, we should nonetheless affirm the trial court's order of denial because he has demonstrated a

---

[3] CBS disagrees with Hunter's assertion that its employment decisions were not themselves matters of public interest. In support, CBS cites undisputed evidence in the record that: (1) weather anchors in the Los Angeles area are "local celebrities"; (2) weather anchors affect the "newscast ratings significantly"; and (3) "[w]eather is the number one reason why people watch local new." Because we conclude CBS's employment decisions regarding its weather anchors were "in connection" with an issue of public interest, we need not resolve whether CBS demonstrated that such conduct was itself a public issue or matter of public interest.

18

reasonable probability of prevailing on the merits. CBS, on the other hand, argues that Hunter has failed to make any such showing and asserts that much of his purported evidence is inadmissible on either hearsay or relevancy grounds.

Because the trial court concluded CBS failed to meet the first prong of the anti-SLAPP statute, it neither addressed whether Hunter met his evidentiary burden under the "merits prong" of the statute (*Navellier, supra*, 29 Cal.4th at p. 93), nor considered the admissibility of the parties' evidence. Under such circumstances, the more prudent course is to remand the matter to the trial court to determine in the first instance whether Hunter demonstrated a reasonable probability of prevailing on the merits of his causes of action. (*Tuszynska, supra*, 199 Cal.App.4th at p. 267 [reversing order finding plaintiff's claims did not arise from protected activity and remanding to trial court to conduct second prong analysis]; *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 568 [same]; *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1195 [in cases where trial court did not conduct the "second prong analysis," reviewing court may "remand the matter" to "decide this issue"].)

## DISPOSITION

The trial court's order denying appellant's motion to strike pursuant to section 425.16 is reversed. The matter is remanded to the trial court with directions to determine whether respondent met his burden of demonstrating a reasonable probability of prevailing on the merits of his claims at trial. Appellant shall recover its costs on appeal.

ZELON, J.

We concur:


WOODS, Acting P. J.　　　　　　　SEGAL, J.[*]

---

[*]　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| KYLE HUNTER, | B244832 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC480825) |
| v. | |
| CBS BROADCASTING, INC., | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Appellant and Defendant. | |

THE COURT:

The opinion in this case filed November 18, 2013 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c) the non-parties' requests pursuant to California Rules of Court, rule 8.1120(a) for publication are granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

WOODS, Acting P. J.,          ZELON, J.,          SEGAL, J.*

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.