Filed 3/26/26  Camper v. Paramount Global CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAMES CAMPER<br><br>    Plaintiff and Appellant,<br><br><br>    v.<br><br><br>PARAMOUNT GLOBAL et al.,<br><br><br>    Defendants and Respondents. | B339150<br><br><br>(Los Angeles County<br>  Super. Ct. No. 23STCV13425) |

APPEAL from an order of the Superior Court of Los Angeles County, Kristin S. Escalante, Judge.  Affirmed.

James Camper, in pro. per., for Plaintiff and Appellant.

Jassy Vick Carolan, Jean-Paul Jassy, Jordyn Ostroff, and Kevin L. Vick, for Defendants and Respondents.

Appellant James Camper viewed a trailer for the reality television show *College Hill: Celebrity Edition*, which referenced, but did not show, a physical altercation between two cast members. Camper claims he was misled by the trailer and other promotional materials to believe the show would include the full altercation. He therefore paid for a subscription to the online streaming service BET Plus for the primary purpose of accessing *College Hill* and watching the promised fight. When the show did not include any additional footage of the altercation, Camper sued the producers and distributors of the show, respondents Paramount Global, Black Entertainment Television, LLC, Edmonds Entertainment, Inc., and This Way Out Media, Inc. His complaint alleged false advertising and related claims.

Respondents filed a special motion to strike the complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16.[1] The trial court granted the motion, finding that Camper's claims were based on respondents' protected conduct, and that Camper had not shown a probability of success on the merits of his claims.

Camper appears in propria persona on appeal, as he did below. He argues that the trial court erred in granting the anti-SLAPP motion. He contends that the advertisements at issue were not protected activity under the statute. He also contends that he met his burden to show a probability of prevailing on the merits because he presented evidence that a significant portion of viewers were deceived by the trailer. We find no error and affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I. *Complaint*

Camper filed his complaint in June 2023 and the operative first amended complaint (FAC) the following month. He alleged six causes of action against respondents: (1) unfair competition under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), (2) false advertising under the False Advertising Law (FAL) (Bus. & Prof. Code, §

---

[1] SLAPP is an acronym for "strategic lawsuits against public participation." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139.) All undesignated statutory references are to the Code of Civil Procedure.

17500 et seq.), (3) violation of the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750), (4) fraudulent misrepresentation, (5) breach of implied contract, and (6) unjust enrichment. The FAC alleged that Camper viewed a trailer for season two of *College Hill*, a reality show "where multiple celebrities are put under one roof to potentially gain college credentials that they did not earn in their younger years, due to pursuing fame and fortune." According to Camper, the trailer showed an argument between two of the show's stars, Amber Levonchuck[2] and Joseline Hernandez, and then "conveyed" that a physical altercation followed. Specifically, the FAC alleged that the trailer showed Levonchuck and Hernandez arguing about racial identity, then showed Levonchuck getting up to confront Hernandez, then cut to other cast members yelling.

Based on the trailer, "media interviews regarding the season, and a circulated screenshot of a physical fight released by" respondents, Camper bought a subscription to BET Plus so he could watch *College Hill*. He alleged that the trailer suggested to viewers that the physical fight would be shown during an episode of the show and that he "would not have been interested in watching *College Hill* absent the disagreement and physical fight between the cast being shown in its entirety." In support of his belief that the altercation would be shown in an episode, Camper also cited a screenshot of the physical altercation, alleging that it was released by respondents on May 11, 2023 and "disseminated all over social media." He additionally cited an interview by Hernandez given on May 25, 2023 discussing the fight.

Camper alleged that he watched episode six, the episode containing the argument, on June 11, 2023. To his disappointment, respondents did not include footage of the physical altercation in the show. Instead, at the moment of the fight, the show displayed the following message, "Out of respect for all parties involved, we have chosen not to show this fight." Camper attached to the FAC a copy of the purported screenshot of the fight and the message displayed during the episode.

Camper alleged that respondents intentionally engaged in false advertising to mislead viewers and induce them to purchase subscriptions.

---

[2]      Levonchuck is popularly known as Amber Rose.

He further alleged that he would not have subscribed to BET Plus or watched the show "if he had known the promotional materials were inaccurate and misleading." Camper claimed that in addition to the $19.98 he paid for his subscriptions, he also "invested hours of time" watching the first five and a half episodes of College Hill, before discovering that the fight was not going to be aired. Camper sought compensatory damages, punitive damages of $2,000,000, and an injunction requiring respondents to show footage of the full altercation to Camper.

## II. *Anti-SLAPP Motion*

In September 2023, respondents filed an anti-SLAPP special motion to strike pursuant to section 425.16. "Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Section 425.16, subdivision (e) describes categories of protected activities "'in furtherance of a person's right of petition or free speech,'" including "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Respondents moved to strike the entire complaint, arguing that all of the causes of action arose from protected speech in a public forum, in connection with the creation and dissemination of a television series starring celebrities. Respondents also argued that Camper could not show a probability of success on the merits of his claims because, among other reasons, he could not establish causation.

In support of the motion, respondents provided evidence including several declarations from members of the production and marketing teams for the show, as well as the footage from the trailer and the episode at issue. Respondents acknowledged that during filming of a class on the campus of Alabama State University (ASU), Levonchuck and Hernandez got into an

4

argument that "escalated into a physical altercation." Respondents aired footage of the argument in episode six of the series, but "exercised their editorial discretion not to air the physical altercation between [Levonchuck] and Hernandez, out of respect for the cast members, crew, and [ASU], as [respondents] did not want to put the school in the position of appearing to condone physical fights in its classrooms or among its students." Respondents released the trailer on April 25, 2023. They noted that all of the footage appearing in the trailer also appeared in the series and that the trailer was the only promotion they released "that alluded to the possibility that there may have been a physical fight."

Respondents denied releasing the screenshot presented by Camper, or "any other screenshot depicting a physical altercation" between the cast members, "as part of an official marketing campaign or for any other purpose." They also stated that they did not exercise any control over the interview given by Hernandez during which she discussed the fight, since by the time the interview was recorded, Hernandez had been expelled from ASU and had left the cast of *College Hill*.

Season two of *College Hill* premiered on BET on May 11, 2023, the same day Camper claims respondents released the screenshot of the fight on social media. Respondents presented evidence that Camper subscribed twice to BET Plus, first on May 17, 2023 and then on June 13, 2023. Both subscriptions began with a free seven-day trial, followed by a paid account charging $9.99 monthly. Hernandez's interview was broadcast on May 25, 2023, after Camper subscribed the first time. Camper's first subscription was terminated due to non-payment. At the time he opened the second account, BET Plus viewer data showed that he had already watched episode six (the episode at issue) several days earlier on June 8, using his first account. In total, Camper paid $19.98 for his subscriptions before his second account was terminated on August 17, 2023.

Camper opposed the motion to strike, arguing that respondents' speech was not protected under the anti-SLAPP statute because it was "false" commercial speech. Camper also argued that he had established a probability of success on the merits of his claims because he had shown that respondents made "actionable misrepresentations" in the advertisements for

*College Hill.* He also contended that he had shown that a "significant portion" of reasonable consumers were misled regarding whether the footage of the physical altercation would be included in the show. He attached as an exhibit purported messages from other social media users expressing agreement with his position. He also included the declaration of another subscriber, who stated that he watched the trailer and believed that the physical fight would be included in the show. Camper also requested discovery in support of his opposition.

Respondents objected to Camper's evidence, including to several paragraphs of the subscriber declaration. They also objected to all of the social media posts compiled by Camper.

On December 22, 2023, the court granted in part Camper's request for discovery. The court found that Camper was entitled to discovery regarding whether respondents had any role in publicly disseminating the screenshot depicting Hernandez and Levonchuck apparently engaging in a physical altercation. The court continued the hearing on the motion to strike and permitted supplemental briefing limited to any evidence obtained in discovery.

Camper filed a supplemental opposition based on the deposition of Jason Harvey, Senior Vice President of Business Operations and Subscriptions for BET. He pointed to Harvey's testimony that although BET did not release the screenshot, it was "possible" that a subordinate employee could have done so because he did not know everyone who handled the footage before it got to the marketing team. Harvey also testified that the marketing team did not distribute or disseminate the screenshot.

Respondents objected to the entirety of the deposition excerpts attached as lacking foundation and to numerous deposition questions. Respondents also argued that Camper's evidence, to the extent it was admissible, did not establish a probability of prevailing on his claims.

## III. *Ruling*

The court held a hearing on April 12, 2024,[3] then took the matter under submission. The court issued a written ruling on May 29, 2024 granting the

---

[3] There is no reporter's transcript of the hearing.

motion to strike.  First, the court sustained all of respondents' objections to the evidence Camper submitted with his original opposition.  The court overruled most of the objections to the deposition excerpts Camper submitted with his supplemental opposition, but noted that some of Harvey's testimony was "of limited value."

Turning to the first step of the anti-SLAPP analysis, the court found that all of Camper's claims "arise directly from the advertising for and alleged promotion of *College Hill*."  The court further concluded that the television program and associated promotional activities constituted protected speech.  Moreover, the court found that speech was made in connection with an issue of public interest, as the episode involved "discussions of issues regarding race and racial identity, and the physical fight that is at the center of [Camper's] claim arose out of a dispute on that topic."

Turning to the second step, the court found Camper's claims under the UCL, FAL, and CLRA failed because he could not establish that "it is probable that a significant portion of the general consuming public or targeted consumers could be misled by the trailer."  Contrary to Camper's suggestion, the court found that the physical altercation "*was* depicted in the episode, with a level of graphic detail that was greater than that in the trailer."  The court described the relevant portion of the episode, including that it showed an "opening swing" by Levonchuck toward Hernandez, followed by "an extended segment of violent and disturbing audio that leaves no doubt that a physical fight is occurring," as well as "audio of other classmates' reactions during and after the event."  The court found that the scene "is much more dramatic than what is shown in the trailer, and nothing that is in the trailer is left out of the scene."  The court further noted that "there is nothing in the trailer that indicates how the fight would actually be depicted in the episode," and found that because the trailer and the episode "both truthfully convey to the viewer that a physical fight between the two women occurred, there is nothing about the trailer and episodes in themselves that would justify a conclusion that a substantial portion of the viewing public would be deceived."

7

The court also found that Camper had not provided any evidence that he relied on either the screenshot of the fight or the interview by Hernandez in deciding to subscribe to BET Plus. Thus, Camper failed to make a prima facie showing "as to reliance or causation as to these materials." In addition, the court found that Camper failed to establish that the screenshot was disseminated by respondents, noting that numerous students with cellphones were visible in the portion of the episode leading up to the fight, among others who might have had access to the image.

The court concluded that the remainder of Camper's claims failed for the same reasons so he had not established a probability of prevailing on the merits. The court granted the motion to strike and dismissed the FAC with prejudice. Camper timely appealed.

## DISCUSSION

### I.  *Section 425.16 and Standard of Review*

"A cause of action arising from a person's act in furtherance of the 'right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability' that the claim will prevail." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788, citing § 425.16, subd. (b)(1).)  As noted above, first, "the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*); see also *Baral, supra*, 1 Cal.5th at p.384.)  "If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.'" (*Park, supra,* 2 Cal.5th at p. 1061.)

"We review de novo the grant or denial of an anti-SLAPP motion. [Citation.]  We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.]  In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. [Citations.]  We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes

8

its entitlement to prevail as a matter of law." (*Park, supra*, 2 Cal.5th at p. 1067.) The appellant bears the burden of affirmatively demonstrating error. (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 671.)

## II.    *Step One: Arising From Protected Activity*

In the first step under the anti-SLAPP analysis, the court determines whether the plaintiff's claims arise from protected activity. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) A defendant meets its first step burden "'by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e).'" (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1519 (*Hunter*); see also *Bonni, supra*, 11 Cal.5th at p. 1009.) As relevant here, a cause of action "arises from protected activity within the meaning of section 425.16, subdivision (e)(4) if the plaintiff's claims are predicated on conduct that is: (1) in furtherance of the right of free speech, and (2) in connection with a public issue or issue of public interest." (*Hunter, supra*, 221 Cal.App.4th at p. 1520.)

Camper's claims arise from the creation of *College Hill* and the advertising of that show. It is well-established that the creation of a television show "is an exercise of constitutionally protected expression." (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 816; see also *Hunter, supra*, 221 Cal.App.4th at p. 1521; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*).) Activities taken to advance such constitutionally protected expression, including advertising and promotion, are also protected speech within the meaning of section 425.16, subdivision (e)(4). (See *Tamkin, supra,* 193 Cal.App.4th at p. 143; *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1039-1040.)

The speech also was made "in connection with" a public issue or issue of public interest. The trial court found that the portion of the *College Hill* episode at issue involved a "topic of widespread, public interest," namely discussions involving race and racial identity. Camper does not dispute this finding, and we agree that it satisfies respondents' burden to establish that the challenged trailer and episode constituted speech made in connection with an issue of public interest. (See *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 [statement protected under section 425.16,

subdivision (e)(4) "when it involves 'a topic of widespread, public interest'"], quoting *Rivero v. American Federation of State, County, and Municipal Employees, AFL–CIO* (2003) 105 Cal.App.4th 913, 919.)

Camper's only challenge to the trial court's first step analysis is his argument that the court should have applied the exception for commercial speech set forth in section 425.17. That section exempts from protection under the anti-SLAPP statute "any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services." (§ 425.17, subd. (c).) However, there is a carve-out from the commercial speech exception for an action "based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work, including, but not limited to, a motion picture or television program." (§ 425.17, subd. (d)(2).)

Camper recognizes that under section 425.17, subdivision (d)(2), speech involving the advertisement of a television program is protected under the anti-SLAPP statute. He argues, however, that the speech at issue here should not be protected because it constituted *false* advertising. The cases he cites do not support his argument. For example, *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 does not involve the applicability of the anti-SLAPP statute at all. Next, in *Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 872 (*Serova*), the Supreme Court analyzed the content of the defendant's commercial speech in assessing the second step of the anti-SLAPP analysis, the plaintiff's probability of prevailing. The court did not discuss the first step or the commercial exception under section 425.17, subdivision (c). (*Ibid.*) To the contrary, whether a statement is false is considered in the second step of the analysis, not the first. (See *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 566 [holding that the allegation that the statements were false "should be considered in the second part of the analysis; whether there is a probability plaintiffs will prevail. In determining whether the alleged conduct is constitutionally protected it is sufficient to determine the conduct constituted" protected speech].)

Lastly, Camper relies on *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, in which the Court of Appeal discussed the applicability of the commercial speech exception under section 425.17, subdivision (c). But

the court concluded that the speech at issue—Yelp's statements about the efficacy of its review filter—fell squarely within the exception. (*Id.* at p. 311.) The court did not discuss the applicability or scope of the carve-out at issue here for speech related to advertising for a television program under section 425.17, subdivision (d)(2). (*Ibid.*) Thus, the case has no bearing on the issues presented here.

As such, we find no error in the trial court's conclusion that respondents met their burden to establish that their conduct was protected under the anti-SLAPP statute.

## III.   *Step Two: Likelihood of Success*

Once the defendant satisfies the first step of the anti-SLAPP analysis, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Baral, supra*, 1 Cal.5th at p. 396.) "The showing must be made through 'competent and admissible evidence.'" (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 26.) A plaintiff "'cannot simply rely on the allegations in the complaint.'" (*Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 664.)

The trial court found that Camper could not establish a likelihood of prevailing on any of his claims because he had not presented evidence that the trailer misled the public or that respondents' conduct caused his alleged damages. We agree with both conclusions. To prevail on his claims under the UCL, FAL, and CLRA, Camper was required to show that "members of the public are likely to be deceived." (See *Kasky, supra*, 27 Cal.4th at p. 951 [claims under UCL and FAL]; *v Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1360 [applying "reasonable consumer" standard to CLRA claims].) "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in

11

the circumstances, could be misled." (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 508.)

Here, Camper presented no evidence that a significant portion of reasonable consumers viewing the *College Hill* trailer could be misled to believe that the show would include additional footage of the physical fight. The court sustained respondents' objections to Camper's primary evidence, the purported collection of social media posts, and Camper does not challenge that evidentiary ruling on appeal. The declarations from Camper and one other viewer regarding their expectations are insufficient to meet Camper's burden. This is particularly true given the evidence that all of the footage in the trailer related to the fight was shown during the episode, as well as audio recordings capturing the fight and onlookers' reactions to it. Further, Camper points to no other indications in the trailer that additional footage would be shown. Thus, Camper cannot make a prima facie showing that it is probable that the trailer was likely to deceive a significant portion of reasonable consumers.

Moreover, Camper failed to present evidence to establish causation, a required element for each of his claims. (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 [UCL and FAL claims require showing that the "injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim"]; *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1386 ["Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."]; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [fraud claim must show resulting damage]; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [breach of contract must show damages to plaintiff resulting from the breach]; *Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 238 [unjust enrichment requires showing of "unjust retention of the benefit at the expense of another"].) The evidence in the record demonstrates that all of the footage from the trailer was shown during the episode. Further, Camper started his second subscription to BET Plus after he watched the episode at issue.[4] As such, he cannot establish that

_____

[4]    In accepting Camper's version of events, as it was required to do, the trial court found that Camper disputed that his original subscription was cut-

the content of the trailer falsely suggested that further footage would be shown or that such a suggestion caused him to subscribe to the platform.

We also agree with the trial court that Camper cannot rely on the screenshot or Hernandez's interview. The latter aired after Camper subscribed to BET Plus, thus he could not have relied on it in deciding to subscribe. As for the screenshot, Camper has provided no evidence that respondents were responsible for its dissemination. The screenshot he submitted to the trial court contains no evidence regarding where or when he obtained it. Respondents have denied responsibility for the screenshot or knowledge of how it was disseminated. Moreover, as the trial court noted, there were numerous people present for the altercation who were not employed by the production. Notably, in his own declaration Camper fails to state that he relied on either the screenshot or the interview in deciding to subscribe to BET Plus.

Camper argues that his claims are like those in *Serova, supra*, 13 Cal.5th 859 and W*oulfe v. Universal City Studios LLC* (C.D. Cal., Dec. 20, 2022) 2022 WL 18216089 (*Woulfe*), but neither case is analogous to this one. In *Serova*, the plaintiff purchased an album of music promising "9 previously unreleased vocal tracks performed by" Michael Jackson. (*Serova, supra*, 13 Cal.5th at p. 867.) For the purposes of the anti-SLAPP motion, the defendant *conceded* that several of the tracks were not performed by Jackson. (*Id*. at p. 870.) Thus, the Court concluded that the defendant's marketing would induce consumers to rely on the false promise of Jackson's vocals to purchase the album. (*Id*. at p. 876.) Similarly, in *Woulfe*, the plaintiffs claimed a movie trailer was misleading because it contained a scene featuring the actress Ana De Armas that never appeared in the final movie. (*Woulfe, supra*, at *1.) The court found that the plaintiffs had established that a

off or that he opened a second account. We do not reach the same conclusion. In his declaration, Camper stated that respondents' claim that he created two streaming accounts was "untrue." However, he then stated that "[i]f two accounts do exist, it is only because this streaming service is known to malfunction. However, in no way was the second account made to deceive. [Respondents] are trying to imply that I somehow planned this lawsuit." Camper's denial that he intended to deceive undermines his denial that he never initiated a second subscription.

significant portion of reasonable consumers could be led to believe that De Armas would appear in the movie based on her presence in the trailer. (*Id*. at p. *8.) By contrast, the evidence here established that the episode contained the same footage of the argument and altercation that was shown in the trailer.

Accordingly, we find that Camper failed to establish a probability of prevailing on his claims.

## DISPOSITION

The order granting the motion to strike is affirmed. Respondents are entitled to their costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.


We concur:


ZUKIN, P. J.


MORI, J.


14